# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ABINGDON DIVISION

**CHRISTOPHER C. COUNTS,**           )
    Plaintiff                              )      Civil Action No. 1:23cv00013
                                )
v.                                         )      **REPORT AND**
                                )      **RECOMMENDATION**
**MARTIN J. O'MALLEY,[1]**              )
**Commissioner of Social Security,**   )      By:  PAMELA MEADE SARGENT
    Defendant                            )      United States Magistrate Judge
                                )

## *I. Background and Standard of Review*

Plaintiff, Christopher C. Counts, ("Counts"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claim for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. §§ 423 and 1381 *et seq.* Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). Neither party has requested oral argument; therefore, this case is ripe for decision.  As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached

---

[1] Martin J. O'Malley, ("O'Malley"), became the Commissioner of Social Security on December 20, 2023.  Pursuant to Federal Rules of Civil Procedure Rule 25(d), O'Malley should, therefore, be substituted for Kilolo Kijakazi as the defendant in this case.  Pursuant to the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), no further action is required to continue this suit.

through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows Counts protectively filed applications for DIB and SSI on January 7, 2021, alleging disability as of November 1, 2020,[2] due to neuropathy; type 1 diabetes; vision issues; anxiety and depression; and a thyroid condition.[3] (Record, ("R."), at 245-46, 249-55, 277, 323, 342.) The claim was denied initially and on reconsideration. (R. at 132-50.) Counts requested a hearing before an administrative law judge, ("ALJ"). (R. at 151.) A hearing was held on May 24, 2022, at which Counts was represented by counsel. (R. at 37-69.)

By decision dated August 12, 2022, the ALJ denied Counts's claims. (R. at 10-25.) The ALJ found Counts meets the nondisability insured status requirements of the Act for DIB purposes through December 31, 2025. (R. at 12.) The ALJ found Counts had not engaged in substantial gainful activity since November 1, 2020, the

---

[2] Counts initially alleged an onset date of November 1, 2018; however, he amended his onset date to November 1, 2020, at the hearing. (R. at 10, 43, 45.)

[3] Counts filed previous claims for DIB and SSI on February 7, 2019, alleging disability as of November 1, 2018, based on type 1 diabetes; peripheral neuropathy; hypothyroidism; and anxiety. (R. at 73, 76.) By decision dated September 30, 2020, an ALJ denied Counts's claims. (R. at 73-82.) Counts appealed this decision, but the Appeals Council denied his request for review. (R. at 274.)

alleged onset date.[4] (R. at 12.) The ALJ determined Counts had severe impairments, namely, diabetes mellitus; peripheral neuropathy; retinopathy; hypothyroidism; and right foot ulcers, but he found Counts did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 12, 15.)

The ALJ found Counts had the residual functional capacity to perform light[5] work, with the ability to occasionally perform postural activities, but not climb ladders, ropes or scaffolds; he could occasionally feel with his lower extremities and occasionally utilize foot controls; he could frequently handle, finger and feel; he had frequent near and far visual acuity and should avoid work with small parts, such as the size of a coin or paperclip; he should avoid concentrated exposure to temperature extremes, vibrations and wetness; he should avoid exposure to industrial hazards; and he was expected to be off task 10 percent of the workday. (R. at 16.) The ALJ found Counts was unable to perform his past relevant work as a fast food manager. (R. at 22-23.) However, based on his age, education, work experience and residual functional capacity and the testimony of a vocational expert, the ALJ found he could perform jobs existing in significant numbers in the national economy, including those of a mail clerk, a housekeeping cleaner and a garment sorter. (R. at 23-24, 61-63.) Thus, the ALJ concluded Counts was not under a disability as defined by the Act, from November 1, 2020, through the date of the decision, and he was not

---

[4] Therefore, Counts must show that he became disabled between November 1, 2020, his alleged disability onset date, and August 12, 2022, the date of the ALJ's decision, to be eligible for benefits.

[5] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2023).

eligible for DIB and SSI benefits. (R. at 24-25.)  *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2023).

After the ALJ issued his decision, Counts pursued his administrative appeals, (R. at 242-44, 371-73), but the Appeals Council denied his request for review. (R. at 1-5.) Counts then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2023). This case is before this court on Counts's motion for summary judgment filed August 7, 2023, and the Commissioner's brief filed December 6, 2023.

## II. Facts[6]

Counts was born in 1993, (R. at 44, 245, 249), which classifies him as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). He has a high school education and past relevant work as a fast food services manager. (R. at 44, 61, 278.) Counts testified that, since the fall of 2020, he had experienced both high and low blood glucose levels, ranging from less than 50 up to 600. (R. at 46.) He said, at the time of the hearing, typical readings were in the 200s and 300s, but he still had highs and lows. (R. at 46.)  Counts testified the low levels caused shakiness, dizziness and blurry vision, neuropathy in his hands and feet and swelling in his feet that caused difficulty walking and balancing, and which had caused him to fall at least twice. (R. at 46.) He stated the high levels caused dizziness, more burning and

---

[6] Counts's only dispute is with respect to the ALJ's assessment of his physical limitations. (Plaintiff's Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 4-5). Therefore, the court will address the facts relevant to Counts's physical residual functional capacity.

pain in his extremities, more feelings of numbness and difficulty opening and closing his hands. (R. at 46.) He said he had experienced daily swelling in both lower extremities, since November 2020, aggravated by standing and walking. (R. at 47.) Counts testified he had diabetic foot ulcers on his right foot since November 2020 and his left foot since early 2021, for which his endocrinologist referred him to a podiatrist. (R. at 47-48.) Despite receiving treatment, Counts testified these ulcers had not improved. (R. at 48.) He stated his insurance had denied orders for diabetic shoes four times. (R. at 48.) Counts also testified he had insurance issues getting supplies for his insulin pump on at least three occasions. (R. at 49.) He stated his endocrinologist also had ordered a continuous blood sugar monitor, which was approved by insurance for the previous three months. (R. at 49-50.) Counts testified he had to input the data from this monitor into the insulin pump at least eight to 10 times daily in order for the pump to make the necessary corrections. (R. at 50.) He stated his endocrinologist also would download the data at his appointments to make further corrections. (R. at 51.) Counts testified he did not have a lot of energy, requiring him to lie down "a lot" due to fatigue, glucose fluctuations, swelling and neuropathy in his lower extremities and pain from the foot ulcers. (R. at 51-52.) He stated that, despite cleaning the wounds daily and changing the dressings about three times a day, they remained open wounds. (R. at 52.) Counts testified he could stand and/or walk for only five to 10 minutes before having swelling, neuropathy, numbness, burning, sharp pains, tingling and loss of balance. (R. at 53.) He said sitting for extended periods caused the same issues. (R. at 53.) Counts testified he normally spent six to seven hours in an eight-hour period reclining due to the issues with his lower extremities. (R. at 54.)

Counts testified he also had neuropathy in his upper extremities, aggravated by movement, such as stretching his arms out, lifting and carrying, which lasted all

day.  (R. at 54-55.)  He said the more he tried to use his hands and arms, the less they wanted to function, noting difficulty with grip.  (R. at 54-55.)  Counts testified he had difficulty extending his arms in all directions, but especially overhead.  (R. at 55.)  He said he could use his hands continuously and repetitively to handle things for no more than five minutes before they would begin to cramp, become numb and lose grip.  (R. at 55.)  Counts testified he also experienced random muscle spasms in the upper extremities throughout the day.  (R. at 56.)  Additionally, he testified he had experienced multiple occasions of an elevated heart rate.  (R. at 56.)  Counts also testified he had hypothyroidism, which caused fatigue, and, although he took medication for this, it made him moody.  (R. at 58.)

Counts testified he lived with his girlfriend and two young children, ages two and eight.  (R. at 59.)  He said the eight-year-old was in school, and the two-year-old stayed with the grandmother from noon until 10:00 p.m., while his girlfriend worked.  (R. at 59.)  He said he did not do much for the eight-year-old, and he might put the two-year-old's diapers in the diaper bag, but he did not change him.  (R. at 60.)  He also stated he did not bathe, dress or feed the two-year-old.  (R. at 60.)

In rendering his decision, the ALJ reviewed records from Dr. Michael Koch, M.D., a state agency physician; Joseph Leizer, Ph.D., a state agency psychologist; Dr. William Rutherford, Jr., M.D., a state agency physician; Ballad Health Diabetes and Endocrinology Abingdon; Southern Medical Group, Inc.; Dr. Brett Compton, O.D.; Norton Community Hospital; Johnston Memorial Hospital; Dr. Matthew Beasey, M.D.; Southeastern Retina Associates; William A. Davis Clinic; Dr. Jared C. Tyhurst, O.D.; and Abingdon Foot and Ankle Clinic.

Dr. Wendy Abbott, D.O., performed a consultative examination of Counts on June 8, 2019. (R. at 392-95.) On examination, among other things, he ambulated without assistance, but had an antalgic gait; he had full muscle strength in all groups, bilaterally, with adequate fine motor movements, dexterity and ability to grasp objects, bilaterally; there was no edema, cyanosis or erythema of the extremities; he had no tender or trigger points; he had good muscle tone; no abnormal reflexes; sensation was intact, except for decreased sensation to touch in both lower extremities; there was no periarticular swelling of any joint; no abnormal reflexes; straight leg raise testing was negative; visual acuity was 20/30 in both eyes without correction; and he had decreased vision in all four fields, but he could count the number of moving fingers. (R. at 393-94.) Dr. Abbott stated Counts was able to sit in no significant distress, walk and stand in the office. (R. at 394.) She opined he would be unable to walk and/or stand for a full workday, but he may be able to sit for a partial workday with allotted occasional breaks. (R. at 394.) Dr. Abbott further opined Counts's condition may be exacerbated by lifting or carrying excessive weight, and he should, therefore, be limited to lifting/carrying less than 10 pounds. (R. at 394.) She opined he also should refrain from excessive bending, stooping and crouching. (R. at 394.) Dr. Abbott stated Counts's vision needed further workup and diagnosis by a specialist. (R. at 394.)

Counts was hospitalized at Johnston Memorial Hospital from July 22 to July 23, 2020, for treatment of diabetic ketoacidosis, ("DKA"),[7] after running out of

---

[7] DKA is a serious complication of diabetes that occurs when the body cannot produce enough insulin, resulting in a buildup of acids in the bloodstream called ketones. Some symptoms of DKA include excessive thirst, frequent urination, nausea and vomiting, stomach pain, weakness and tiredness, shortness of breath, fruity-scented breath and confusion. Untreated DKA can lead to death. See mayoclinic.org/diseases-conditions/diabetic-ketoacidosis/symptoms-causes/syc-2037551 (last visited Mar. 22, 2024).

insulin pump supplies when he lost his insurance.  (R. at 668.)  Upon discharge, it was noted he would return to insulin injections, as he could not afford further insulin pump supplies.  (R. at 676.)

On August 11, 2020, Dr. Matthew Beasey, M.D., Counts's treating endocrinologist, completed a form, opining that Counts met the medical listing for diabetes mellitus, found at 20 C.F.R. Part 404, Subpart P, Appendix 1, § 9.00B5[8] and had done so since the age of five.  (R. at 503.)  As the basis for this opinion, Dr. Beasey simply wrote "Type I [diabetes mellitus.]"  (R. at 503.)

On October 8, 2020, Counts established as a new patient at the William A. Davis Clinic, reporting he had not had a primary care doctor for a couple of years. (R. at 567.)  Counts's chronic health conditions were listed as type 1 diabetes, diagnosed at age five, and hypothyroidism.  (R. at 567.)  Caroline Boardwine, N.P.-C, a board-certified nurse practitioner, noted Counts was back on an insulin pump after regaining his insurance, and he was treating with Dr. Beasey for his diabetes and hypothyroidism.  (R. at 567.)  Boardwine also noted Counts underwent an incision and drainage on a back abscess earlier that week, for which he was taking antibiotics.[9]  (R. at 567.)  Examination was normal, aside from the abscess, which

---

[8] It is noted that § 9.00 is the medical listing for endocrine disorders found at Part 404, Subpart P, Appendix 1.  Listing 9.00 for endocrine disorders states that these disorders are evaluated under the listings for other body systems.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 9.00(B) (2023).  While Dr. Beasey opined that Counts's impairments met or equaled the listed impairment for diabetes mellitus found at § 9.00B5, this section merely defines diabetes mellitus and other pancreatic gland disorders.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 9.00B5 (2023); *see also* 20 C.F.R. §§ 404.1525(d), 416.925(d) (2023) (impairment cannot meet the criteria of a listing based only on a diagnosis).

[9] The record shows that Counts presented to the emergency department at Norton Community Hospital on October 5, 2020, with an abscess to the mid back.  (R. at 662-63.)  An

was scabbed over and without drainage.  (R. at 569-70.)  Normal findings included no edema, cyanosis or clubbing; a normal gait; and normal pulmonary and cardiovascular findings.  (R. at 569.)  Boardwine diagnosed type 1 diabetes with hyperglycemia and skin ulcer; and unspecified hypothyroidism.  (R. at 570.)  She continued his current plan of care, which included the insulin pump and Synthroid, initiated Lipitor and aspirin, and she counseled Counts on appropriate diet and exercise and daily glucose checks and logging.  (R. at 545, 568, 570-71.)  Boardwine referred Counts for a diabetic eye exam and ordered appropriate lab testing.  (R. at 571.)  This lab work showed a blood glucose reading of 525 mg/dL and a hemoglobin A1c reading of 14 percent.[10]  (R. at 557-58.)

On November 2, 2020, when Counts saw Dr. Beasey for a follow up on his diabetes, his glucose level was 323.  (R. at 512.)  Dr. Beasey noted Count's hospitalization for DKA four weeks previously, but he stated Counts had no long-term diabetic complications.  (R. at 512.)  Counts's A1c level was 13 percent, and he reported average glucose levels of 200 to 300, with a couple of lows.  (R. at 512, 515.)  He said he stated to feel shaky and clammy when his level hit 120.  (R. at 512.)  Counts endorsed fatigue, shortness of breath, leg swelling, excessive thirst, frequent urination, myalgias and dizziness.  (R. at 513-14.)  Examination was normal, except for absent vibratory perception in both feet up to the mid shin.  (R. at 514-15.)  Other findings included a normal gait and balance; no focal

---

incision and drainage was performed, which Counts tolerated well and without complication.  (R. at 664-65.)

[10] No matter when an individual last ate, a blood sugar level of 200 mg/dL or more suggests diabetes.  A hemoglobin A1c test shows an individual's average blood sugar level for the previous two to three months.  It measures the percentage of blood sugar attached to hemoglobin.  An A1c level of 6.5 percent or more on two separate tests means a person has diabetes.  *See* mayoclinic.org/diseases-conditions/diabetes/diagnosis-treatment/drc-20371451 (last visited Mar. 22, 2024).

abnormalities and normal sensation to light touch and pinprick; no deformities of the feet; present posterior tibial and dorsalis pedis pulses in both feet; and normal pulmonary and cardiovascular findings. (R. at 514.) Dr. Beasey diagnosed diabetes mellitus type 1 with markedly poor control historically; hypothyroidism; and diabetic neuropathy. (R. at 515.) He made no changes to Counts's insulin, and he noted Counts would receive a continuous glucose monitor by mail for which he would receive training. (R. at 515.)

Counts saw Dr. Jared C. Tyhurst, O.D., on November 5, 2020, for a complete eye examination to rule out diabetic complications. (R. at 740.) His corrected visual acuity was 20/20 while using both eyes at a distance of 16 feet. (R. at 740.) There was a small, shallow, circular visual field defect in both eyes; dot blot hemorrhages in the maculae and the vascular arcades; and signs of neovascularization along the vascular arcades in the left eye. (R. at 740.) Dr. Tyhurst found that the examination indicated severe nonproliferative diabetic retinopathy in the right eye and proliferative diabetic retinopathy in the left eye,[11] which necessitated evaluation and treatment by an ophthalmologist. (R. at 740.) He referred Counts to Dr. Mark E. Kleinman, M.D. (R. at 740.)

Counts presented to the emergency department at Norton Community Hospital on November 18, 2020, for left hand pain due to an abrasion on the left

---

[11] Diabetic retinopathy occurs when high blood sugar levels damage the blood vessels in the retina. Without treatment, it can lead to vision loss. Nonproliferative diabetic retinopathy, ("NPDR"), refers to the early stages of the condition, while proliferative diabetic retinopathy, ("PDR"), describes the final and most severe stage. The main difference between NPDR and PDR is the presence of new, or proliferating, blood vessels, which may be described as "neovascularization." *See* medicalnewstoday.com/articles/proliferative-vs-nonproliferative-diabetic-retinopathy#differences (last visited Mar. 22, 2024).

wrist.  (R. at 657.)  On examination, a wound was noted with mild surrounding erythema.  (R. at 658.)  Otherwise, findings were normal, including normal cardiovascular findings and normal musculoskeletal range of motion.  (R. at 658.) Counts was diagnosed with mild cellulitis of the left upper extremity and received antibiotics.  (R. at 659.)

On November 23, 2020, Counts saw Dr. Chris Larzo, M.D., at Southeastern Retina Associates, for Avastin injections for bilateral PDR.  (R. at 534-35.)  Counts tolerated the procedures well without complication.  (R. at 535.)  Visual acuity in the right eye was 20/30 and in the left eye was 20/40.  (R. at 534.)  He also saw Dr. Kleinman that same day, for a retinal evaluation of both eyes. (R. at 536-38.) Counts reported mildly blurred central vision in both eyes, of gradual onset, for the previous year and affecting all activity.  (R. at 536.)  An examination revealed neovascularization in the mid-periphery of the retina of both eyes, as well as vitreous hemorrhage in both eyes.  (R. at 537.)  Dr. Kleinman recommended panretinal photocoagulation, ("PRP"),[12] treatment once these findings resolved.  (R. at 537.)

Counts returned to Boardwine on January 12, 2021, reporting he was not taking the Lipitor and aspirin added at his previous appointment, but he agreed to start.  (R. at 545.)  He endorsed excessive thirst.  (R. at 547.)  Examination was normal, including no extremity edema, cyanosis or clubbing; normal heart rate and

---

[12] PRP is the standard of care for treating PDR.  PRP is a laser treatment that creates a thermal burn in the retinal tissue, resulting in coagulation necrosis.  The PRP treatment prevents abnormal new vessels on the retina and in the drainage system of the eyeball from growing and encourages existing ones to shrink and scar up.  PRP does not improve vision; the aim is to prevent severe vision loss and/or pain due to fluid buildup raising pressure in the eye.  *See* emedicine.medscape.com/article/1844294-overview?form=fpf (last visited Mar. 22, 2024); *see also* hey.nhs.uk/patient-leaflet/panretinal-photocoagulation-laser-prp/ (last visited Mar. 22, 2024).

rhythm; normal gait; no skin abnormalities; and intact sensation.  (R. at 547-48.)
Lab testing revealed a blood glucose reading of 206.  (R. at 550.)

Dr. Larzo administered additional Avastin injections on January 19, 2021.  (R. at 579.)  At that time, Counts's vision remained the same, at 20/30 in the right eye and 20/40 in the left eye.  (R. at 579.)  The right eye continued to show no cystoid macular edema, and the left eye was stable, with mild preretinal findings consistent with an epiretinal membrane.  (R. at 579.)  Dr. Larzo continued to diagnose active PDR in both eyes.  (R. at 580.)  The need for future PRP was, again, discussed.  (R. at 580.)  When Counts saw Dr. Kleinman on February 19, 2021, he diagnosed stable, active PDR in both eyes and administered more Avastin injections.  (R. at 590-91.)

When Counts saw Dr. Beasey on March 9, 2021, his A1c reading was up to 13.4 percent from 13 percent at the previous visit, and he stated his glucose levels were running from 200 to 280.  (R. at 603, 606.)  At the time of the visit, his reading was 243.  (R. at 606.)  Counts continued to report occasional hypoglycemic episodes, with a glucose level of 68 that morning, during which he felt shaky, clammy and sweaty.  (R. at 603.)  He also reported levels of less than 50 not infrequently, associated with some hypoglycemic unawareness.  (R. at 603.)  Dr. Beasey noted that Counts was compliant with his insulin pump.  (R. at 603.)  Counts endorsed fatigue, leg swelling, myalgias, calluses on his feet, dizziness and numbness.  (R. at 604.)  Examination findings were largely normal, except for absent vibratory perception in both feet up to the mid shin and a tachycardic heart rate.  (R. at 605.)  Otherwise, Counts had a normal gait and balance, intact sensation to light touch and pinprick, no foot deformities and a regular heart rhythm with normal apical impulse and normal S1 and S2.  (R. at 605.)  Counts's diagnoses remained unchanged, and

Dr. Beasey noted he would benefit greatly from a continuous glucose monitor.  (R. at 606.)

On June 25, 2021, Counts's glucose was 191, and his A1c was back down to 13 percent.  (R. at 628.)  He reported that, although the continuous glucose monitor had been approved, he had not yet received it.  (R. at 628.)  Counts stated he was having worsening hypoglycemic unawareness, as well as high fasting glucose levels.  (R. at 628.)  He endorsed fatigue, trouble swallowing, visual disturbance, shortness of breath, leg swelling, urinary frequency, a callus on his foot, dizziness, weakness and numbness.  (R. at 629-30.)  On examination, Counts's thyroid was not enlarged and had no palpable nodules; he was in no respiratory distress and had clear breath sounds, bilaterally, without rales, rhonchi and wheezing; although he had a tachycardic heart rate, rhythm was regular, and the apical impulse was normal with normal S1 and S2; he had a normal gait and balance; sensation was normal to light touch and pinprick; both feet were normal of deformities; and both feet presented with absent vibratory perception to the mid shin.  (R. at 630.)  Dr. Beasey increased Counts's insulin.  (R. at 631.)

On September 21, 2021, Counts's A1c level was down to 12.1 percent.  (R. at 720.)  He still did not have the glucose monitor, and he stated his checks at home frequently ranged in the 200s to 300s, with readings below 50 about once every two weeks.  (R. at 720.)  Counts reported some continued hypoglycemic unawareness and neuropathy in both feet.  (R. at 721.)  He also reported two wounds on the right foot.  (R. at 720.)  Counts endorsed visual disturbance; shortness of breath; swelling of the feet and ankles; frequent urination; muscle weakness, pain and cramps; and dizziness.  (R. at 722.)  On examination, Dr. Beasey noted two, nondraining wounds on the plantar surface of the right foot; vibratory sensation was present in both feet;

there were no focal neurological deficits; and pulmonary and cardiovascular findings were normal, including normal heart rate and rhythm. (R. at 722.) Counts's diagnoses remained unchanged, and Dr. Beasey increased his insulin dosage and referred him to a podiatrist. (R. at 723.)

On May 19, 2021, Dr. Michael Koch, M.D., a state agency physician, completed a physical residual functional capacity assessment, in which he opined Counts could perform light work, except he could occasionally perform postural activities; frequently handle and finger objects; and he should avoid concentrated exposure to hazards, such as machinery and heights. (R. at 93-94.) Dr. Koch based these findings on Counts's allegation that he must take multiple breaks when on his feet; that his hands cramp and want to close, making it difficult to push and or pull with the upper extremities; allegations of intense hand pain; and neuropathy in the hands and feet. (R. at 93-94.) On September 20, 2021, Dr. William Rutherford, Jr., M.D., another state agency physician, completed a physical residual functional capacity assessment, also opining Counts could perform light work, except he could frequently operate foot controls, bilaterally; he could occasionally perform postural activities; he was limited in both near and far visual acuity, bilaterally, to 20/30 in the right eye and 20/40 in the left eye; and he should avoid concentrated exposure to extreme temperatures, wetness, vibration and hazards. (R. at 109-10.) Dr. Rutherford based these findings on Counts's diabetes and hypothyroidism diagnoses, with absent vibratory sensation in the feet, and his reduced visual acuity. (R. at 109-10.)

On September 30, 2021, Counts returned to Boardwine, reporting Dr. Beasey was trying to get insurance approval for an insulin pump. (R. at 715.) He was continuing to take Synthroid for hypothyroidism and Lipitor for hyperlipidemia. (R.

at 715.)  Examination was normal, except for diminished sensation in the feet and two diabetic ulcers on the right foot.  (R. at 716-17.)  Otherwise, Counts had no extremity clubbing, cyanosis or edema; and he had a regular heart rate and rhythm, with no murmurs and normal S1 and S2.  (R. at 717.)  Boardwine diagnosed type 1 diabetes with hyperglycemia and foot ulcer; acquired hypothyroidism; mixed hyperlipidemia; and a nonpressure, chronic ulcer of the right foot.  (R. at 717.)  She ordered lab testing and prescribed antibiotics for the ulcers.  (R. at 717.)  On October 25, 2021, Counts reported his right knee had been swelling and popping for the previous few days.  (R. at 713.)  Examination findings were normal, including no clubbing, cyanosis or edema; regular heart rate and rhythm, no murmurs and normal S1 and S2; normal motor strength in all extremities; and intact sensation.  (R. at 713.)  Boardwine diagnosed primary osteoarthritis of the right knee, for which she prescribed 800 mg ibuprofen.  (R. at 713-14.)

Counts saw Dr. Brian Mazzei, D.P.M., a podiatrist at Abingdon Foot and Ankle Clinic, on October 27, 2021, for evaluation of the two open ulcers on his right foot.  (R. at 748.)  He reported burning and tingling in the feet.  (R. at 748.)  On examination, Counts had dorsalis pedis and posterior tibial pulses of +1/4, bilaterally, and capillary fill time of less than three seconds, bilaterally; right hemorrhagic calluses under the first and fifth metacarpophalangeal joint on the right foot with local erythema; decreased vibratory sensation, bilaterally; full muscle strength in all major muscle groups, bilaterally, without pain; ankle dorsiflexion greater than 10 degrees, bilaterally, with extended knee; and normal subtalar joint range of motion of the first metacarpophalangeal joint, bilaterally.  (R. at 748-49.)  Dr. Mazzei diagnosed infected diabetic ulcer on the right foot.  (R. at 749.)  He discussed daily diabetic foot care and the need to bandage the wounds daily and to wear supportive shoes in the house at all times.  (R. at 749.)  Dr. Mazzei debrided

the calluses and prescribed antibiotics and diabetic shoes.  (R. at 749.)  On November 10, 2021, Counts reported his ulcers were doing better.  (R. at 750.)  He had no coverings on the wounds.  (R. at 750.)  Dr. Mazzei noted the areas of ulceration were closed over, callused and dirty, without drainage or erythema.  (R. at 750.)  He diagnosed improved ulcerations, grade 0.  (R. at 750.)  Counts stated he did not yet have the diabetic shoes, and Dr. Mazzei prescribed Bactroban and urged him to wear shoes at all times.  (R. at 750.)  On December 21, 2021, Counts stated the ulcers had worsened, reporting he "sometimes" used the prescribed topical ointment and "sometimes" wore shoes.  (R. at 752.)  Dr. Mazzei noted the areas were callused with superficial ulcerations, but without erythema or drainage.  (R. at 752.)  He diagnosed uninfected diabetic ulcers and debrided the tissue.  (R. at 752.)  Dr. Mazzei again urged daily diabetic foot care and wearing shoes at all times.  (R. at 752.)  He also urged Counts to soak the foot in Epsom salts before applying the ointment and to bandage the wounds daily.  (R. at 752.)

When Counts saw Dr. Beasey on January 13, 2022, his A1c was 12.4 percent.  (R. at 725-26.)  He reported having a few glucose readings below 50, usually in the mornings, but typical readings were 250 or greater.  (R. at 726.)  Counts stated his insurance still had not approved a continuous glucose monitor.  (R. at 726.)  He endorsed fatigue; shortness of breath; leg swelling; abdominal pain; frequent urination; neuropathy; foot callus; and dizziness.  (R. at 727.)  On examination, he had tachycardia, but otherwise normal cardiovascular findings; normal pulmonary findings; no abdominal distention; and no focal neurological deficit.  (R. at 727.)  Dr. Beasey noted Counts had been seeing a podiatrist, and his wounds were improving.  (R. at 728.)  On March 8, 2022, Counts received a different insulin pump, on which he received training.  (R. at 730-33.)  On April 12, 2022, Counts's A1c level was down to 11.5 percent, and he reported only rare low glucose readings.

(R. at 742.)  A download of the insulin pump data revealed universally high glucose levels.  (R. at 745.)  Counts endorsed fatigue; visual disturbance; leg swelling; excessive thirst; frequent urination; myalgias; neuropathy; and easy bruising/bleeding.  (R. at 744.)  Examination was completely normal, including normal heart rhythm and sounds.  (R. at 744.)  Dr. Beasey increased Counts's insulin and ordered lab testing.  (R. at 745.)

Counts returned to Dr. Mazzei on March 30, 2022, reporting two open wounds on the right foot and stating he still had not obtained diabetic shoes.  (R. at 753.)  On examination, dorsalis pedis and posterior tibialis pulses were +2/4 on the right with capillary fill time of less than three seconds; there were calluses on the right foot with central hemorrhagic areas, but no drainage, erythema or purulence; and there was decreased vibratory sensation.  (R. at 753.)  Dr. Mazzei diagnosed infected right foot diabetic ulcers, and he advised Counts he needed the diabetic shoes as soon as possible to help get them offloaded.  (R. at 754.)  He debrided the tissue and urged Counts to use bandages daily.  (R. at 753.)

Counts returned to Boardwine on May 23, 2022, reporting he had "[b]een [d]oing [o]kay," noting his A1c was down to 9.6 from 13.  (R. at 757.)  He complained of swelling in the lower legs and feet, and he noted his foot ulcerations were getting better.  (R. at 757.)  Boardwine recommended ankle brachial index, ("ABI"), testing,[13] to which Counts agreed.  (R. at 757.)  He had an elevated heart rate, which, he stated he had most of the time, and he admitted to palpitations, but denied chest pain and headaches.  (R. at 757.)  Counts stated he continued to take

---

[13] The ABI is a simple test that compares the blood pressure measured at the ankle with the blood pressure measured at the arm.  It is used to check for peripheral artery disease in the blood vessels of the legs.  *See* mayoclinic.org/tests-procedures/ankle-brachial-index/about/pac-20392934 (last visited Mar. 22, 2024).

aspirin, but stopped taking the statin. (R. at 757.) On examination, he had lesions to both lower extremities, but no clubbing, cyanosis or edema; he had tachycardia, but no murmurs and normal S1 and S2; normal motor strength in all extremities and intact sensation; and diminished sensation in the feet, but normal strength, 1+ pedal pulses and scabbed ulcerations to both feet. (R. at 758-59.) Boardwine added palpitations and edema of the lower extremities to Counts's diagnoses, she referred him for ABI testing and an echocardiogram, and she prescribed Lipitor. (R. at 759-61.) She also ordered appropriate lab testing. (R. at 759-62.) On May 27, 2022, Counts underwent ABI testing, which indicated no evidence of significant lower extremity arterial occlusive disease. (R. at 772.)

On May 31, 2022, Counts told Dr. Mazzei he "sometimes" used bandages on his foot "when he can think about it." (R. at 769.) He said he had not heard from the provider regarding his diabetic shoes. (R. at 769.) On examination, dorsalis pedis and posterior tibialis pulses were +2/4 on the right, and capillary fill time was less than three seconds; there was no edema of the right lower extremity; there were two ulcers on the right foot, both with local erythema and some drainage; and there was negative vibratory sensation to the right forefoot. (R. at 769.) Dr. Mazzei diagnosed two infected diabetic ulcers on the right foot, which he debrided, and prescribed antibiotics. (R. at 769.) He urged Counts to keep the foot dry while bathing and to use Betadine bandages daily. (R. at 769.)

On June 3, 2022, Counts presented to the emergency department at Norton Community Hospital with complaints of right foot pain and swelling. (R. at 777.) He reported that, the day after he last saw Dr. Mazzei and his right foot calluses were debrided, he developed worsening pain, redness and swelling with nausea, fever and chills. (R. at 777.) An x-ray of the right foot showed no acute osseous abnormality,

but Counts met sepsis criteria, including tachycardia, leukocytosis and cellulitis, for which he was admitted.  (R. at 777, 788.)  A duplex right venous ultrasound, dated June 6, 2022, showed no deep vein thrombosis.  (R. at 792.)   Over the course of his hospitalization, Counts received intravenous antibiotics, which ultimately failed to improve the sepsis.  (R. at 778.)  After consulting a general surgeon, Dr. Christopher G. Yeary, D.O., an incision and drainage was performed on June 8, 2022, at which time skin necrosis, deep purulent drainage and underlying tissue with a dusky appearance was noted.  (R. at 778.)  Dr. Yeary noted Counts was at high risk for further incision and drainage and amputation in the future if he did not control his diabetes.  (R. at 778, 788-89.)  It was noted that Counts's A1c improved from 11.5 to 9.5 since using his insulin pump and glucose monitor.   (R. at 778.)   An echocardiogram was performed, which showed a normal left ventricular ejection fraction of 60 to 65 percent; no evidence of pulmonary hypertension; normal diastolic function; no significant stenotic or regurgitant valve lesions; and no vegetations.  (R. at 790-91.)  Counts was discharged on June 10, 2022, in stable condition with antibiotics and a probiotic and instructed to follow up with his primary care provider.  (R. at 778.)  He had normal cardiovascular findings at that time, including regular rate and rhythm and no murmurs, rubs or gallops.  (R. at 778.)  It further was noted Counts would require home health with wound care.  (R. at 778.)  Discharge diagnoses included sepsis due to right foot cellulitis with diabetic ulcer of the great toe; hyponatremia; calluses of the right foot; hypothyroidism; and hypertension.  (R. at 779.)

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2023). *See also Heckler v. Campbell*, 461 U.S.

458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (2023).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. § 423(d)(2)(A) and § 1382c(a)(3)(A)-(B); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all the relevant evidence and whether the ALJ sufficiently

explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Counts argues that the ALJ's decision is not based on substantial evidence. (Plaintiff's Brief at 1, 5.)  Specifically, he argues the ALJ erred by improperly determining his residual functional capacity, as he rejected the opinions of Dr. Beasey and Dr. Abbott.  (Plaintiff's Brief at 4-5.)

Counts filed his applications in January 2021; thus, 20 C.F.R. §§ 404.1520c, 416.920c govern how the ALJ considered the medical opinions here.[14] When making a residual functional capacity assessment, the ALJ must assess every medical opinion received in evidence. The regulations provide that the ALJ "will not defer or give any specific evidentiary weight, including controlling weight" to any medical opinions or prior administrative medical findings, including those from the claimant's medical sources. 20 C.F.R. §§ 404.1520c(a), 416.920c(a) (2023). Instead, an ALJ must consider and articulate how *persuasive* he finds all the medical opinions and all prior administrative medical findings in a claimant's case. *See* 20 C.F.R. §§ 404.1520c(b),  (c)(1)-(5),  416.920c(b),  (c)(1)-(5) (2023)  (emphasis  added). Moreover, when a medical source provides more than one opinion or finding, the ALJ will evaluate the persuasiveness of such opinions or findings "together in a single analysis" and need not articulate how he or she considered those opinions or findings "individually." 20 C.F.R. §§ 404.1520c(b)(1), 416.920c(b)(1) (2023).

---

[14] 20 C.F.R. §§ 404.1520c, 416.920c apply to claims filed on or after March 27, 2017. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15132-01, 2017 WL 1105368 (Mar. 27, 2017)).

The most important factors in evaluating the persuasiveness of these medical opinions and prior administrative medical findings are supportability and consistency, and the ALJ will explain how he considered these two factors in his decision. *See* 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2) (2023). "Supportability" means "[t]he extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1). "Consistency" denotes "the extent to which the opinion is consistent with the evidence from other medical sources and nonmedical sources in the claim." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2). The ALJ is not required to explain the consideration of the other three factors, including relationship with the claimant, specialization and other factors such as an understanding of the disability program's policies and evidentiary requirements.[15] *See* 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2).

A claimant's residual functional capacity refers to the most the claimant can still do despite his limitations. *See* 20 C.F.R. §§ 404.1545(a), 416.945(a) (2023). The ALJ found Counts had the residual functional capacity to perform light work, with the ability to occasionally perform postural activities, but not climb ladders, ropes or scaffolds; he could occasionally feel with the lower extremities and occasionally utilize foot controls; frequently handle, finger and feel; he had frequent near and far

---

[15] An exception to this is that when the ALJ finds that two or more "medical opinions or prior administrative medical findings about the same issue are both equally well-supported [] and consistent with the record [] but are not exactly the same," the ALJ will explain how he considered the other most persuasive factors including: the medical source's relationship with the claimant, specialization and other factors that tend to support or contradict a medical opinion. 20 C.F.R. §§ 404.1520c(b)(3), 416.920c(b)(3) (2023).

visual acuity and should avoid work with small parts, such as the size of a coin or paperclip; he should avoid concentrated exposure to temperature extremes, vibrations and wetness; he avoid exposure to industrial hazards; and he was expected to be off task 10 percent of the workday.  (R. at 16.)

Counts argues that the ALJ erred by rejecting the opinions of Dr. Beasey and Dr. Abbott in arriving at his residual functional capacity finding.  For the reasons that follow, I disagree.  First, with respect to Dr. Beasey, Counts's treating endocrinologist, he argues that his opinion that Counts's impairments were of listing-level severity, is supported by objective observations, examinations and testing.  Specifically, on August 11, 2020, Dr. Beasey completed a form, stating that Counts met the medical listing for diabetes mellitus, found at 20 C.F.R. Part 404, Subpart P, Appendix 1, § 9.00B5, and had done so since the age of five.  (R. at 503.) Dr. Beasey's basis for this opinion was simply Counts's diagnosis of type 1 diabetes. (R. at 503.)  As stated above, however, § 9.00B5 merely defines diabetes mellitus and other pancreatic gland disorders.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 9.00B5 (2023).  Instead, an evaluation of impairments resulting from endocrine disorders, such as diabetes mellitus, is performed under the listings for other body systems.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 9.00B (2023).  If a claimant's impairment(s) does not meet or medically equal a listing in another body system, he may or may not have the residual functional capacity to perform substantial gainful activity.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 9.00C (2023).  In such circumstances, analysis of the fourth and, if necessary, the fifth steps of the sequential evaluation process in 20 C.F.R. §§ 404.1520, 416.920 will be performed. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 9.00C.

In his decision, the ALJ stated he did not consider the persuasiveness of Dr. Beasey's statement that Counts's impairments met a medical listing because, pursuant to the regulations, this is an issue reserved to the Commissioner. *See* 20 C.F.R. 404.1520b(c), 416.920b(c) (2023) (issues reserved to the Commissioner, including statements about whether a claimant's impairment(s) meets or medically equals a listing, are inherently neither valuable nor persuasive to the issue of disability.) The ALJ did, nonetheless, proceed to analyze Counts's impairments for listing-level severity, concluding that the evidence did not establish the level of severity required under § 9.00 when evaluated under other listings, including, but not limited to, the listings for diabetic retinopathy; slow-healing bacterial and fungal skin infections; and diabetic peripheral and sensory neuropathies. (R. at 15-16.) It is well-settled that the claimant bears the burden of proving that his impairment(s) meets or equals the criterial of a listing. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987). Moreover, the listings require an "exacting standard of proof." *Stacey D.R. v. Kijakazi*, 2022 WL 420393, at *6 (E.D. Va. Jan. 25, 2022) (citing *Sullivan v. Zebley*, 493 U.S. 521, 532-33 (1990)). "For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan*, 493 U.S. at 530.

Here, I find that substantial evidence supports the ALJ's finding that Counts's impairments did not meet listing § 2.02[16] for impairments of loss of central visual acuity because his remaining vision in the better eye after best correction was not 20/200 or less. (R. at 15.) Specifically, this is supported by the record evidence,

---

[16] Listing § 2.02 requires a claimant's remaining vision in his better eye to be 20/200 or less after best correction. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 2.02 (2023).

including treatment notes from November 2020 and January 2021 indicating Counts's visual acuity was 20/30 in the right eye and 20/40 in the left eye. (R. at 534, 579.) Nonetheless, the ALJ included limitations in the residual functional capacity finding to accommodate Counts's visual impairment, including no work with small parts. I further find that substantial evidence supports the ALJ's finding that Counts's impairments did not meet listing § 8.04[17] because he did not have chronic skin infections with extensive fungating or ulcerating skin lesions that persisted at least three months despite continued treatment as prescribed. (R. at 15.) As the ALJ explained in the decision, the treatment notes do not show that Counts's diabetic foot ulcerations persisted for any three-month period during the relevant time period. Counts presented to Dr. Beasey with nondraining right foot wounds on September 21, 2021, and nurse practitioner Boardwine noted the same on September 30, 2021. (R. at 18, 717, 720.) On October 27, 2021, Counts reported two open ulcers on his right foot that had been present for a month to Dr. Mazzei, the podiatrist. (R. at 19, 748.) By the time he returned to Dr. Mazzei on November 10, 2021, less than two months after his first complaint of the ulcers, he stated his wounds were improving, and Dr. Mazzei graded them as a "0." (R. at 19, 750.) Similarly, on December 21, 2021, only superficial ulcerations with no sign of infection were noted. (R. at 19, 752.) However, Counts complained of problems with foot ulcers again on March 30, 2022, which Dr. Mazzei debrided. (R. at 19, 753.) Less than a month later, Dr. Beasey noted the wounds were improving, and on May 23, 2022, Counts advised Boardwine the ulcerations were improving. (R.

---

[17] Listing § 8.04, which relates to chronic infections of the skin or mucous membranes, requires the following: extensive fungating or extensive ulcerating skin lesions that persist for at least three months despite continuing treatment as prescribed. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 8.04 (2021). This listing was in effect at the time of the ALJ's decision, but has since been replaced by § 8.09.

at 19, 745, 757.)  When Counts returned to Dr. Mazzei on May 31, 2022, he reported bandaging his ulcers when he thought about it.  (R. at 19, 769.)  Infection was noted, and he was encouraged to use proper care and obtain proper diabetic footwear.  (R. at 19, 769.)  Dr. Mazzei debrided the wounds.  (R. at 769.)  On June 3, 2022, Counts was hospitalized for 10 days after becoming septic due to the recent debridement. (R. at 19, 777.)   An incision and drainage was performed, and Counts received intravenous antibiotics.  (R. at 19, 778.)  Skin necrosis was noted at that time.  (R. at 778.)  Thus, the record demonstrates that, during the relevant time period, there was no three-month period during which Count's foot lesions persisted.  Additionally, the regulations specify that a claimant must follow treatment *as prescribed*, and Counts is noted to be nonadherent to recommended treatment at nearly every visit. (R. at 748, 750, 752, 754.)  Nonetheless, the ALJ accounted for such foot ulceration by limiting Counts to, among other things, occasional feeling with the lower extremities and occasionally using foot controls; and avoiding concentrated exposure to vibrations.

Next, I find that substantial evidence supports the ALJ's finding that Counts's impairments did not meet Listing § 11.14[18] for peripheral neuropathy, as he did not have disorganization of motor function in two extremities, resulting in an extreme limitation in the ability to stand up from a seated position, balance while standing or walking or use the upper extremities.  (R. at 15.)  He further stated Counts did not have a marked limitation in physical functioning or a marked limitation in one of the

---

[18] Listing 11.14 requires peripheral neuropathy, characterized either by (A) disorganization of motor function in two extremities, resulting in an extreme limitation in the ability to stand up from a seated position, balance while standing or walking or use the upper extremities; or (B) a marked limitation in physical functioning and in one of the following: (1) understanding, remembering or applying information; or (2) interacting with others; or (3) concentrating, persisting or maintaining pace; or (4) adapting or managing oneself. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.14 (2021).

mental functions, as set out in the listing.  (R. at 15.)  In his decision, the ALJ acknowledged Counts's allegations of peripheral neuropathy in the hands, legs and feet, resulting in hand cramping and difficulty holding onto items, as well as issues being on his feet for long periods.  (R. at 17.)  The ALJ also noted that some examinations revealed decreased sensation or absent vibratory sensation in the lower extremities, while others did not.  (R. at 18-19.)  However, no motor deficits were noted, Counts had normal strength, and he walked with a normal gait.  (R. at 19, 21.)  For example, the ALJ noted that, in September 2021, although Dr. Beasey found Counts had diminished sensation, he, nonetheless, had normal strength and no edema.  (R. at 21.)  In May 2022, Counts also had normal strength, despite decreased sensation.  (R. at 21.)  The ALJ further noted that he included handling, fingering and feeling limitations in his residual functional capacity finding based on Counts's allegation of neuropathy in the upper extremities, although he did not generally complain of such issues to providers.  (R. at 22.)  Thus, the record does not demonstrate peripheral neuropathy, characterized by disorganization of motor function in two extremities.

Additionally, such evidence does not show the requisite marked limitation in physical functioning.  The regulations define a "marked" limitation for this criterion as meaning "due to the signs and symptoms of [the claimant's] neurological disorder, [he is] seriously limited in the ability to independently initiate, sustain, and complete work-related physical activities. …"  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.00G2a (2023).  The regulations define such work-related physical activities to include things like standing up from a seated position, balancing while standing or walking or using both upper extremities for fine and gross movements.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.00G3a (2023).  In addition to the record evidence cited by the ALJ, the court notes that, in November 2020, Counts had a

normal gait and balance; no focal neurological abnormalities and normal sensation to light touch and pinprick; no foot abnormalities; and present pulses in both feet. (R. at 514.)  In January 2021, examination was normal, including no extremity edema, cyanosis or clubbing; a normal gait; and intact sensation.  (R. at 547.)  In March and June 2021, Counts's examination findings, were mostly normal, including normal gait and balance, intact sensation to light touch and pinprick and no foot deformities.  (R. at 605, 630.)  On September 21, 2021, vibratory sensation was present in both feet.  (R. at 722.)  On September 30 and October 25, 2021, Counts had no extremity clubbing, cyanosis or edema, as well as normal motor strength in all extremities.  (R. at 713, 717.)  Also on October 25, 2021, he had decreased vibratory sensation in both feet, but full strength in all major muscle groups and intact sensation.  (R. at 713.)  A couple of days later, he had decreased vibratory sensation in both feet, but full strength in all major muscle groups, bilaterally, without pain.  (R. at 748.)  In May 2022, Counts had no extremity clubbing, cyanosis or edema and normal motor strength in all extremities and intact sensation, except for the feet.  (R. at 758-59.)  ABI testing in May 2022 revealed no evidence of significant lower extremity arterial occlusive disease.  (R. at 772.)  Later that month, Counts again exhibited negative vibratory sensation in the right foot, but there was no lower extremity edema.  (R. at 769.)  Nonetheless, I find that the ALJ accommodated Counts's peripheral neuropathy by limiting him to, among other things, no more than the occasional performance of postural activities and no climbing of ladders, ropes or scaffolds; no more than occasional feeling with the lower extremities and occasionally using foot controls; no work with small parts; and no concentrated exposure to vibrations.

With regard to Counts's hypothyroidism, the ALJ correctly noted that, like diabetes mellitus, a thyroid gland disorder no longer is a listed impairment, and is

evaluated under § 9.00 for endocrine disorders.  Pursuant to § 9.00B2, thyroid gland disorders affect the sympathetic nervous system and normal metabolism, and thyroid-related changes are evaluated in changes in blood pressure and heart rate that cause arrhythmias or other cardiac dysfunction under § 4.00; thyroid-related weight loss under § 5.00; strokes under § 11; and cognitive limitations, mood disorders and anxiety under § 12.00.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 9.00B2 (2023). The ALJ noted that, here, Counts's hypothyroidism did not cause any severe limitations that would meet or equal any of the listings.  (R. at 16.)  I first note that, in his decision, the ALJ did not find that Counts's major depressive disorder or anxiety, either singly or in combination, was severe, a finding Counts does not challenge on appeal to this court.  (R. at 13.)  Therefore, I will not address whether Counts's hypothyroidism caused any severe limitations that would meet or equal the listings for cognitive disorders, mood disorders and anxiety under § 12.00.  Next, with regard to cardiac disorders under § 5.00, the treatment notes reveal that, although Counts had some episodes of tachycardia and lower extremity swelling, cardiovascular findings largely were normal.  In particular, In November 2020, Counts complained of leg swelling, but Dr. Beasey noted normal cardiovascular findings, including normal apical impulse and normal S1 and S2.  (R. at 514.)  That same month, at an emergency department visit for left hand pain, it was noted Counts had a normal heart rate and rhythm.  (R. at 658.)  In January 2021, he reported no cardiovascular symptoms to Boardwine, and examination was normal, including normal heart rate and regular rhythm, as well as no extremity clubbing, cyanosis or edema.  (R. at 547.)  In March and June 2021, Counts again reported leg swelling, and an examination revealed tachycardia, but he had a regular heart rhythm, normal apical impulse and normal S1 and S2.  (R. at 605, 630.)   In September 2021, he reported ankle and foot swelling, but exhibited a normal heart rate and regular rhythm.  (R. at 722.)  Later that month, Counts denied problems or concerns

regarding his hypothyroidism, and he denied chest pain and an irregular heartbeat. (R. at 715.)  Examination findings were normal, including no murmur, a regular rate and rhythm, normal S1 and S2 and no extremity clubbing, cyanosis or edema.  (R. at 717.)  In January and April 2022, Counts reported leg swelling, and he exhibited tachycardia, but had a regular heart rhythm and normal heart sounds.  (R. at 727, 744.)  In May 2022, he complained of swelling in the lower legs and feet, and Boardwine noted an elevated heart rate, which Counts stated he had "most of the time." (R. at 757.)  He also endorsed palpitations.  (R. at 757.)  Despite tachycardia, Counts had no murmur and normal S1 and S2, as well as no extremity clubbing, cyanosis or edema.  (R. at 758.)  ABI testing indicated no evidence of significant lower extremity arterial occlusive disease.  (R. at 760, 772.)  In June 2022, Counts had tachycardia when he was hospitalized with sepsis, but by the time of discharge a week later, he exhibited normal cardiovascular findings, including regular heart rate and rhythm, as well as no murmurs, gallops or rubs.  (R. at 777-78, 788.)  Additionally, there is no evidence in the record that Counts was ever referred to a cardiologist or any other specialist or a more extensive cardiac assessment or treatment.

With regard to § 5.08, the listing for weight loss due to any digestive disorder, this listing requires that a claimant have a BMI of less than 17.50 calculated on at least two evaluations at least 60 days apart within a consecutive six-month period. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 5.08 (2023).  Here, the record documents Counts's height at 5 feet 10 inches tall.  (R. at 514.)  His weight, during the relevant time period, fluctuated from a low of 143 pounds with a BMI of 20.6 on June 25, 2021, to a high of 162.8 pounds with a BMI of 23.36 on May 23, 2022.  (R. at 514, 605, 630, 716, 723, 745, 748, 750, 752-53, 758, 769.) Thus, Counts's BMI never met the requirement of the listing on even one occasion.  Lastly, with regard to §

11.04, the listing for strokes, a "vascular insult to the brain" is required, which simply is not supported by the record evidence. Nonetheless, I find that the ALJ accommodated Counts's hypothyroidism by, among other things, allowing for an off-task rate of 10 percent of the workday.

Counts also argues that the ALJ erred by rejecting the June 2019 opinion of Dr. Abbott. For the following reasons, I find the ALJ appropriately considered its persuasiveness under the regulations, ultimately finding it to be unpersuasive. (R. at 22.) Dr. Abbott opined Counts could not walk or stand for a full workday or sit for a partial workday with allotted breaks. (R. at 394.) She further opined he could lift less than 10 pounds and should refrain from excessive bending, stooping and crouching. (R. at 394.) The ALJ found the limitation from "excessive" bending, stooping and crouching, as well as the inability to stand/walk for a full workday and sit for a partial workday to be vague. (R. at 22.) The ALJ found that generally limiting Counts to sedentary work was inconsistent with Dr. Abbott's own examination findings, which included some decreased sensation in the lower extremities and an antalgic gait, but no motor deficits and no upper extremity issues. (R. at 22, 393-94.) Additionally, Dr. Abbott noted that Counts was able to sit, walk and stand without significant distress in the office. (R. at 22, 394.) *See* 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1) (2023) ("The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) …, the more persuasive the medical opinion(s) … will be."). The ALJ also found that Dr. Abbott's opinion is unsupported by the other evidence of record, including findings, as set out herein, of normal strength and gait, despite some findings of absent vibratory sensation and more recent issues with right foot ulcers. (R. at 22.) The ALJ concluded these findings did not support additional walking and standing limitations. (R. at 22.) Lastly, the ALJ found that

the record evidence did not support an impairment that would limit Counts's ability to lift. (R. at 22.) For example, Counts did not complain of upper extremity issues to Dr. Beasey, and none were noted on examination, in March and June 2021. (R. at 603-05, 628-30.) When he saw Dr. Mazzei in October 2021, Counts had full motor strength in all major muscle groups, bilaterally, without pain. (R. at 748.) Moreover, the court notes that Dr. Abbott's opinion was rendered in June 2019, nearly a year and a half prior to Counts's alleged onset date, and it was considered by the previous ALJ in rendering the prior decision, dated September 30, 2020.

For all these reasons, I find that substantial evidence supports the ALJ's consideration of Dr. Abbott's opinion and ultimate finding that it is unpersuasive.

The ALJ gave partial weight to the prior ALJ's decision, dated September 30, 2020, which limited Counts to light work with the occasional performance of postural activities and no more than occasional exposure to work hazards. (R. at 20.) The ALJ appropriately considered the prior decision under *Albright v. Comm'r of Soc. Sec. Admin.*, 174 F.3d 473 (4th Cir. 1999). Specifically, he found Counts had exhibited worsening issues secondary to diabetic retinopathy, neuropathy and foot ulcers since the prior decision, which supported additional postural, manipulative and environmental limitations. (R. at 20.) Nonetheless, the ALJ noted that the prior decision was issued a short time before the current period at issue, and evidence not considered previously showed no changes that would substantially alter the residual functional capacity in the current decision. (R. at 20.)

Lastly, the ALJ found the opinions of Drs. Koch and Rutherford, the state agency physicians, partially persuasive, insofar as their opinions that Counts could perform light work were consistent with and supported by the record. (R. at 21.)

However, the ALJ included additional nonexertional limitations in his residual functional capacity finding than found by Drs. Koch and Rutherford based on the expanded record. (R. at 21.) In particular, the ALJ added limitations to account for Counts's loss of sensation, fatigue, allegations of upper extremity neuropathy, occasional low blood sugar levels and retinopathy. (R. at 21-22.) Based on the record evidence set out herein, I find that the ALJ's consideration of these opinions is supported by substantial evidence.

For the reasons stated herein, I find substantial evidence exists to support the ALJ's consideration of the medical evidence and his ultimate residual functional capacity finding.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1.    Substantial evidence exists in the record to support the ALJ's consideration of the medical evidence;

2.    Substantial evidence exists in the record to support the ALJ's residual functional capacity finding; and

3.    Substantial evidence exists in the record to support the Commissioner's finding that Counts was not disabled under the Act and was not entitled to DIB and SSI benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Counts's motion for summary judgment and affirm the Commissioner's decision denying benefits.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Senior United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:      April 10, 2024.

_/s/_ _Pamela Meade Sargent_
UNITED STATES MAGISTRATE JUDGE